UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

ESTATE OF KYLE THOMAS BRENNAN,
by and through its Administrator,
Victoria L. Britton,

Plaintiff,

vs.                                        Case No. 8:09-cv-00264-T-23-EAS

CHURCH OF SCIENTOLOGY
FLAG SERVICE ORGANIZATION, INC.,
DENISE MISCAVIGE GENTILE,
GERALD GENTILE, and
THOMAS BRENNAN,

        Defendants.
_____/

## ESTATE'S RESPONSE TO
## DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

The ESTATE OF KYLE THOMAS BRENNAN files the following response to the

Defendants' collective Motion for Summary Judgment as follows:

The evidence conclusively shows that the death of Kyle Brennan was due to

Defendants intentionally imposing Scientology policies upon a mentally disabled adult.

## INTRODUCTION

The complaint alleges that the individuals were volunteers for Scientology and that

Denise Gentile was a Chaplain to Thomas Brennan based on his multiple police interviews.

It turns out that Denise Gentile is not a Chaplain, but a student auditor, which is a closer

relationship to the Defendant, Church of Scientology, its Ethics Officer, and its Office of

Special Affairs. Liability does not depend on the many false statements of the Defendants.
It depends on their admissions, the evidence, and Scientology policies proving:

1.     Defendants knew Kyle was mentally disabled as early as May 2006;

2.     Per policy, Denise Gentile reported to FSO[1] that Kyle was seeing a
psychiatrist and taking a psychotropic drug, which then caused the FSO to engage
its policies to order Thomas Brennan to move his son out and "handle" him; and

3.     The FSO orders to "handle" Kyle Brennan resulted in his death.

To understand why and how this could happen it must first be noted that Scientology
absolutely hates Psychiatry and psychotropic drugs, such as Lexapro, and is determined
in destroying all of Psychiatry.  Second, Scientology written policies must be followed or
the Scientologist faces punishment.  Lance Marcor, a dedicated and highly trained
Scientologist from 1978 to 2007, with most of his time spent at FSO in Clearwater Florida,
explains how the policies were applied to the individual Defendants to achieve the goal of
"disconnection" to "handle" the "PTS"[2] situation caused by the presence of Kyle Brennan
The quoted words are very distinct in Scientology terminology. **[Lance Marcor Second
Declaration - Exhibit 1]**

Further, as explained in Mr. Marcor's attached Declaration, there are many records
which have not been provided or produced, which are absolutely mandated by Scientology
policy.  Those records include the written communication between the "Office of Special
Affairs," a/k/a OSA, and the Ethics Officer and/or Denise Miscavige, which reports are

---

[1]FSO is the Defendant, Church of Scientology Flag Service Organization, Inc.

[2] PTS is a Scientology term meaning Potential Source of Trouble.

disclosed in the privilege log.  However, the responses from OSA, who is really exerting control over the individuals and the individuals are complying with their orders per Scientology policy, have been withheld from discovery.

## SUMMARY OF ARGUMENT

If Thomas Brennan had not encouraged his son to come to Clearwater, or if he had followed his first inclination to drive his son back to Virginia immediately upon his arrival, then this case would never have been filed.  But in following his religious practice which he imposed upon his son at the direction of FSO with the help of Denise Gentile and Gerald Gentile, his son is dead.

Thomas Brennan had a duty to his son, Kyle Brennan, as a mentally disabled social guest while Kyle resided with him in his apartment from February 7 to 16, 2007.  That duty was not to expose Kyle Brennan to unreasonable risk and to use reasonable care under the circumstances.

All Defendants assumed a duty under statutory and common law to use reasonable care under the circumstances when they intervened and  took control over the care and treatment of Kyle Brennan, a mentally disabled adult.  First, they took away his anti-depressant medicine, Lexapro.  Second, they knew or should have known that Kyle should not be left alone and that Tom Brennan had a loaded 357 revolver accessible to Kyle. These two independent actions breached the duties they owed to Kyle Brennan resulting in his death, so that it can be said, but for the reckless and intentional acts of these Defendants, the death would not have occurred.

## MEMORANDUM OF LAW

In this case, the Defendants acted not only with gross negligence and reckless disregard of the rights and safety of Kyle Brennan, but also intentionally, all of which resulted in death.  An intentional act does not require proof of a duty.  Intentional acts simply require proof of an intentional act and legal causation.  Defendants' motion only address claims of negligence.

In order to establish a claim of negligence, the Plaintiff must prove the following:

1.      The defendant owed a duty, or obligation, recognized by law, requiring the defendants to conform to a certain standard of conduct, for the protection of others against unreasonable risks;

2.      The defendant failed to conform to that duty; and

3.      There must be a reasonably close causal connection between the nonconforming conduct and the resulting injury to the claimant.

*Williams v. Davis*, 974 So.2d 1052 (Fla. 2007).  Whether a duty of care exists is a question of law.  *McCain v. Florida Power Corp.*, 593 So.2d 500, 502 (Fla. 1992).  Whether there has been a breach is a jury question.

## I.      THE ESTABLISHMENT OF DUTY

Contrary to what Defendants argue, there is a duty of care between Thomas Brennan and Kyle Brennan, not as father and son, but as Kyle being a social guest in the premises of Thomas Brennan.  Apparently, the Defendants are not aware of the case of *Wood v. Camp*, 284 So.2d 691, 695 (Fla.1973).  In *Wood,* the supreme court eliminated

the distinction between commercial (business or public) visitors and social guests upon the premises. Both commercial and social invitees are entitled to a "single standard of reasonable care under the circumstances." *Wood*, 284 So.2d at 695 (emphasis supplied); *Spadafora v. Carlo*, 569 So.2d 1329, 1331 (Fla. 2nd DCA 1990).

> Florida law explicitly creates "a duty of reasonable care to maintain the premises in a reasonably safe condition for the safety of business invitees on the premises, which includes reasonable efforts to keep the premises free from transitory foreign objects or substances that might foreseeably give rise to loss, injury, or damage." Fla. Stat. § 768.0710(1). ... The duty of reasonable care includes "a duty not only to react to hazards of which it has notice but also to inspect to ensure conditions are safe or, at the least, that hazards (unless open and obvious) are discovered and warned against." *Food Lion, LLC v. Monument/Julington Assoc. Ltd.*, 939 So.2d 1106, 1107-08 (Fla. 1st DCA 2006). Whether the "duty to maintain the premises has been breached is ordinarily a question for the jury to decide." Id. at 1108; see also *Aaron v. Palatka Mall, LLC*, 908 So.2d 574, 578 (Fla. 5th DCA 2005) ("When an injured party alleges that the owner or possessor breached the duty to keep the premises in a reasonably safe condition, an issue of fact is generally raised as to whether the condition was dangerous and whether the owner or possessor should have anticipated that the dangerous condition would cause injury despite the fact it was open and obvious.")

*Frede v. J.C. Penney Corp., Inc.*, 2007 WL 2254513 (M.D.Fla).

Additionally, all Defendants had a duty to Kyle Brennan which arose from the general facts of the case. Prior to interfering with the treatment of the mental disability of Kyle Brennan, the Defendants, Denise Gentile, Gerald Gentile, and FSO had no duty to him. Once these Defendants interjected themselves, the duty to act as a reasonable person, not a reasonable Scientologist, arose under the common law and Florida Statutes. It then becomes an issue of foreseeability as to whether injury can occur if an anti-depressant is abruptly discontinued or withheld from a disabled adult.

The recklessness, gross negligence and willful conduct results in liability of FSO under §768.1355, *Fla.Stat.,* the Volunteer Protection Act, since it is now known that the individual Defendants were volunteers acting under orders from FSO rendering the principal and its agents liable for the death of Kyle Brennan.  *Malicki v. Doe*, 814 So.2d 347 (Fla. 2002).

> Apparent authority exists when the principal creates the appearance of an agency relationship. *Ja Dan, Inc. v. L-J Inc.*, 898 F.Supp. 894, 900 (S.D.Fla.1995). The appearance of an agency relationship can be created when the principal knowingly permits the agent to act as if the agent is authorized, or "by silently acting in a manner which creates a reasonable appearance of an agent's authority," but cannot "arise from the subjective understanding of the person dealing with the purported agent." Id.

*Whetstone Candy Co., Inc. v. Kraft Foods, Inc.*, 351 F.3d 1067, 1077 -1078 (11th Cir. (Fla.) 2003).

As a direct result of Denise Gentile informing the FSO Ethics Officer that Kyle was under psychiatric care and on an anti-depressant, the Ethics Officer acts under written Scientology policies and gives written orders to Thomas Brennan to "handle"[3] his son.  **[Marcor Second Declaration - Exhibit 1].**  They all assumed a duty of care to Kyle Brennan when they took control of his mental treatment.  That duty is simply to use reasonable care in protecting Kyle Brennan from reasonably foreseeable harm.

> "It is axiomatic that an action undertaken for the benefit of another, even gratuitously, must be performed in accordance with an obligation to exercise reasonable care." *Barfield ex rel. Barfield v. Langley,* 432 So.2d 748 (Fla. 2d DCA 1983) (citing *Banfield v. Addington*, 104 Fla. 661, 140 So. 893 (1932)); see also Restatement (Second) of Torts § 323 (1965).

---

[3]The word "handle" is defined by Scientology as "finish off, complete, end cycle on."  "Anything fully handled need no further care or attention from anyone."  Modern Management Technology Defined, by L. Ron Hubbard.  [See exhibit 12, paragraph 12 of **Marcor Second Declaration - Exhibit 1].**

*Horton v. Freeman*,  917 So.2d 1064, 1066 -1067 (Fla. 4th DCA 2006).

In addition to the common law duty, there is also a duty under §825.102, *Fla.Stat.:* it is unlawful to

• intentionally inflict physical or psychological injury upon a disabled adult; or

• perform any intentional act that could reasonably be expected to result in physical or psychological injury to disabled adult; or

•  to actively encourage  any person to commit an act that results or could reasonably be expected to result in physical or psychological injury to a disabled adult.

Thomas Brennan had the extra duty of not making a loaded gun accessible to a person of unsound mind under § 790.17, *Fla.Stat.*  The other Defendants can have this same duty if the jury infers they had knowledge of the gun.

Is it foreseeable?  There is foreseeability and no intervening cause to relieve the Defendants of liability. *Flight Training, Inc. v. Tropical, Inc.*,  2007 WL 5117263, 6 (S.D.Fla. 2007) (foreseeability asks 'whether the harm that occurred was within the scope of danger attributable to the defendant's negligent conduct.' " *Id.* (quoting *Gibson v. Avis Rent-A-Car System, Inc.*, 386 So.2d 520, 522 (Fla.1980)); *Sogo v. Garcia's National Gun, Inc.,* 615 So.2d 184 (Fla. 3d DCA 1993) (where the seller of gun to a person who later commits suicide is actionable even though the seller had no warning of the suicidal thoughts of the buyer, but the seller violated the ordinance requiring three day waiting period); and *Wyke v. Polk County School Bd.*, 129 F.3d 560 (11th Cir. (Fla.) 1997) (where a need for counseling for anger problems and behavioral problems observed by the defendants were enough to create an issue of foreseeability to be decided by the trier of fact under Florida

law).   As seen in the log below, depositions, and police interviews, Thomas Brennan admits he observed problems with his son and he told Denise Gentile, who then told the FSO Ethics Officer.

Defendants argue that there is no proof that Kyle Brennan was a disabled adult from the time he arrived in Clearwater on February 7, 2007 until his death on February 16, 2007, a total of 9 days. Whether or not they knew he was a mentally disabled adult  is not the issue.   The question is whether the harm that occurred was within the scope of danger attributable to the Defendant's negligent conduct.   It doesn't take a doctor to realize that there may be danger in taking away a person's anti-depression medication when that person is in an obviously troubled state of mind that he cannot be left alone.   The following evidence shows the Defendants knew that Kyle Brennan was being treated by a psychiatrist, on a anti-depressant, in need of help, and therefore a disabled adult.

### 1.    Victoria Britton's Daily Log [Exhibit 2]

While Kyle Brennan was still alive, Victoria Britton kept a daily log in a journal which she then transferred to a computer.   After Kyle's death, Victoria Britton submitted the log to the Clearwater Police by letter dated September 10, 2007.  Now, over three years later and after discovery in this case, the logs are extremely revealing as to the knowledge of Tom Brennan, Gerald Gentile, Denise Gentile, and FSO on the issue of when they knew Kyle Brennan was indeed a disabled adult.  Her daily logs show:

Before flight to Tampa

February 7 (same day Kyle calls his uncle Gary)
- Tom said Kyle seemed fine mentally over the phone, but he was very tired.

After arrival in Clearwater

February 8.
- Tom is **very busy with a class** and it cost him a great deal of money
- Tom then said he was **afraid to leave Kyle alone**.
- Tom was afraid **Kyle would hurt himself**
- Tom was **afraid Kyle would commit suicide**

February 9
- Tom said Kyle is doing much better

February 10 or 11
- Tom calls and is very agitated and anxious. Hands the phone over to "his friend Denise" to see how you (Victoria) can **help Kyle for a serious drug problem**
- Denise talks to Victoria about Narconon
- Narconon calls Victoria and agrees they are not the place for Lexapro

February 12   (same day Denise audits Tom)
- Victoria calls Tom and tells him Narconon agreed it is not the right place
- Tom complains Kyle is **sleeping a lot**

February 14
- Tom is complaining that Kyle **sleeps all day** and is taking advantage of him.
- Tom says he wished he had driven Kyle back to Virginia the first day he arrived
- "**The Church is putting a lot of pressure on him**."
- Victoria tells Tom she will fly down there Tuesday or Wednesday.

February 15 (allegedly same day "list of actions' prepared by Ethics Officer)
- **Tom calls to tell Victoria that Kyle must move out over the weekend**
- Victoria asks why Tom has been trying to rid himself of Kyle ever since Kyle arrived.

The above log shows Tom Brennan is certainly aware that his son is suicidal and sleeping a lot. What he may not know is that the sleepiness is the side effect of taking Lexapro. His church is putting a lot of pressure on him. At this time, Victoria Britton does

not know what type of pressure that is, or why the church is exerting pressure, but she does know it is all related to Kyle in some way.  She certainly does not know the church ordered Thomas Brennan to move his son out of the apartment, because on February 15, 2007, Thomas Brennan tells her he must leave because he has rented out Kyle's bedroom.

### 2.      Gary Robinson's phone call

A known side effect of Lexapro is being tired, which Kyle had complained about. **[Gary Robinson Declaration - Exhibit 3]**.   From the above notes of phone calls between the parents, Tom Brennan is complaining that Kyle is sleeping all day.  Combining these notes of the unusual sleep pattern with Kyle sounding just fine over the phone but saying the Lexapro is making him tired, during phone calls he had with his Uncle Gary Robinson and another with his father on February 7, 2007, all point to strong evidence that Kyle is taking his Lexapro on a daily basis as he promised his uncle he had been doing since the assault in Hawaii on February 5, 2007. **[Id.]**.

### 3.      Defendants' statements and testimony

At the crime scene,  Tom Brennan told the first responding police officer, Jonathan Yuen, that Kyle had been suffering from depression for the last 6-7 months and was on prescribed psychiatric medication, Lexapro 10mg. **[Police - Exhibit 4, p.11]**.[4]  This is not just a little depression or sadness.  This confirms Victoria Britton's recollection that she told Tom Brennan in May or June 2006, that Kyle was taking Lexapro and seeing a psychiatrist. **[Exhibit  2]**.  Denise Gentile states that when Kyle came to Clearwater on February 7, 2007, within a day or two Tom had told her about Kyle being on psychiatric drugs and

---

[4]"Police" refers to the official Clearwater Police Report, excerpts attached at Exhibit 3

possibly seeing a psychiatrist. **[D. Gentile deposition - Exhibit 5, p.37-38; Police - Exhibit 4, p.72]**.  Yet, in her deposition, Denise also states she did not know of Kyle ever being on Lexapro. **[p.80]**.   Perhaps she did not know the name of the prescription drug. A week prior to the death, Tom Brennan and Denise Gentile agreed that on the topic of Kyle Brennan: "something should be done, like, he should go somewhere."  **[Police - Exhibit 4, p.72]**.  This is evidence of their assumption of duty by interfering with the treatment of Kyle Brennan.

Due to their very close friendship, **[T. Brennan deposition - Exhibit 6, p.137:20-25]**, it is hard to believe that Brennan did not tell Denise Gentile of Kyle seeing a psychiatrist and taking psychiatric drugs when he first learned about it in May or June of 2006.  However, it is clear that at least a week before the death, Denise Gentile and Tom Brennan know of the Lexapro, psychiatric treatment, and determined something must be done.  This triggers the requirement of reports to the Ethics Office, but which have not been produced.  Once Denise Gentile has this knowledge, she reports, as she must, to the Ethics Officer at FSO.  **[Marcor Second Declaration- Exhibit 1]**.

After Denise Gentile and Tom Brennan decide to take action, Tom Brennan and Denise Gentile called Victoria Britton on February 10 or 11, 2007. Denise recommended a Scientology group known as Narconon, to help get Kyle off his drugs.  Victoria refused and demanded Tom promise he would make sure Kyle kept taking his Lexapro.  Tom told Victoria he would, but in his deposition, he admitted that he lied to Victoria.  **[Brennan deposition - Exhibit 6, p.138:16-18].**  He knew he had to get rid of the Lexapro under

pressure from his church.**[Police - Exhibit 4, p.11;  V. Britton's 2-15-10 daily log - Exhibit 2; and List of Actions by Ethics Officer - Exhibit 7]**.

In his deposition when asked whether Denise Gentile was more than a friend to him, Tom Brennan said she was just a friend, but a very good friend.  When asked if she was his Chaplain, he said no and also denied that he ever told Officer Yuen or Det. Bohling that Denise was "Chaplain Denise."  **[T. Brennan - Exhibit 6, p.130:25 to p.141]**.  Yet Officer Yuen and Det Bohling say otherwise in their official report, where Tom Brennan told them at least three times that Denise Gentile was his Chaplain.

Therefore, based on Tom Brennan's and Denise Gentile's admissions, they knew Kyle was suffering from depression, they knew he should not be left alone, they knew he was being treated by a psychiatrist, and therefore, they knew he was a disabled adult.

Since Tom Brennan tells Denise Gentile everything, it can be inferred that Gerald "Jerry" Gentile knows everything that is going on since he is home from Friday through Monday and Tom Brennan tells Det. Bohling that "Jerry" is his good friend.  "Jerry" is the first person who Tom Brennan called upon discovering his dead son and Jerry was there when the police arrived.  **[Police - Exhibit 4, p.11]**.  Gerald Gentile argues he had no involvement in this death.  Really?  Then why is he writing a "Knowledge Report," (KR), to OSA Int[5] in Los Angeles, California and copy to the local OSA office? **[Exhibit 8].**  Where are the KR's written by Tom Brennan and Denise Gentile *before and after* Kyle Brennan's death?  OSA has been involved with Tom Brennan since May 2006.  (See privilege log attached as exhibit 3 to **Marcor Second Declaration -Exhibit 1**).  OSA is involved while

_____

[5]"OSA Int" is Office of Special Affairs International

Kyle Brennan is visiting his father.  These KR's or Ethic Officer reports and OSA responses are required. **[Marcor Second Declaration - Exhibit 1].**

Similar to the Gentiles, FSO assumed the same common law and statutory duty to Kyle Brennan when its Ethics Officer gave orders to Thomas Brennan.  The order to "handle" Kyle is the smoking gun. **[Marcor Second Declaration - Exhibit 1]**. FSO's actions were intentional and reckless.  FSO does not care how the PTS situation is handled, just as long as it is handled so that the Potential Trouble Source vanishes.

## II.    BREACH OF DUTY

Tom Brennan knew something was wrong with Kyle when he first arrived until the day he died.  The Lexapro was locked in his car's trunk and Tom Brennan told Officer Yuen that on the day he died, "he did not feel it was beneficial to leave Kyle alone," but he did anyway. **[Police - Exhibit 4, p. 11]**.  Brennan also told Officer Yuen that Kyle was scheduled to leave on the following Monday, but in his deposition he admitted that Kyle was not scheduled to leave. **[T. Brennan Deposition - Exhibit 6, p.217:19-22]**. Tom Brennan chose to leave a loaded 357 magnum revolver in his apartment with his son, who he feared could not be left alone, and who he thought was suicidal, on his first day in the apartment on February 8, 2007.   This violates § 790.17, *Fla. Stat.*, since Kyle is a person of unsound mind, particularly after the Lexapro is taken away and he has no access to it. Yet, Thomas Brennan chose to leave him alone and this was a breach of duty to his son, a social guest, for not acting as a reasonable person under the circumstances and increasing the risk of injury to his guest from a condition of the premises: an accessible loaded gun.

The Gentiles and FSO state they did not know Tom Brennan had a gun.  It does not matter.  Denise Gentile started the process of getting the Lexapro and Kyle removed by reporting the situation to FSO Ethics Officer per the privilege log and as explained by Lance Marcor.  All of the Defendants breached their duty to Kyle Brennan by collectively engaging in actions to increase the likelihood of his demise: locking up his Lexapro for reasons explained above, then ordering Kyle to move out and ordering the father to "handle" his son.

Tom Brennan did not believe in psychiatric medications because of his "religious beliefs."  Kyle was not a Scientologist.  Kyle was not taking his medication because Tom "encouraged" Kyle to stop taking the medication and took the prescription bottle from him approximately 3 days before February 16, 2007. **[Police - Exhibit 4, p.11]**.  Yet in his deposition he states Kyle gave it to him because he did not like it.  **[T. Brennan Deposition - Exhibit 6, p.136].**  In his deposition, Tom Brennan was not sure when he took the Lexapro away, saying it was 2-3 days before his death. **[p.133]**.  It is most likely February 15, 2007, the day he was ordered by his Ethics Officer to "handle" his son.  **[Marcor Second Declaration - Exhibit 1]**.  FSO's control even lasted beyond the date of death when OSA  recommended to Tom Brennan that he hire Paul Johnson, a lawyer who has represented FSO for many years. **[T. Brennan  - Exhibit 6, p.148]**.

Consequently, all Defendants had a duty under §825.102, *Fla. Stat.*, not to do anything which would inflict  physical or psychological injury upon Kyle; or perform any intentional act that could reasonably be expected to result in physical or psychological

injury; or to actively encourage any person to commit an act that results or could reasonably be expected to result in physical or psychological injury.

Likewise, Denise Gentile sending Knowledge Reports to the Ethics Officer, who is the enforcer of the policies of Scientology, who then actively orders Tom Brennan to commit acts which resulted, or could reasonably be expected to result in physical or psychological injury to Kyle creates liability for breach of duty.   **[Marcor Second Declaration - Exhibit 1].**   The instruction to "handle" another in Scientology parlance is a tremendous order requiring immediate action or face more severe consequences.  Thus, because of Denise Gentile's multiple communications to the Ethics Officer, see attached privilege log, the Ethics Officer then involved FSO into the ultimate outcome of Scientology policy: "Disconnection" resulting in an unnecessary and preventable death of a 20 year old adult who was not a Scientologist.

Would a reasonable person, whether it be a father, a good friend, an employer, a spiritual counselor known as an Auditor, and a church representative, the Ethics Officer, impose their religious beliefs upon another and  act superior to a medical doctor by abruptly discontinuing a prescribed anti-depressant and substitute it with vitamins, in addition to providing access to a loaded 357 magnum to a person who should not be left alone?

Tom Brennan told Officer Yuen that Kyle did not know he had a the 357 revolver. **[Police - Exhibit 4, p. 12]**.  Really?  Tom Brennan forgot to tell the officer that Kyle had known about the revolver since 2005 when Kyle lived with Tom Brennan for approximately 6 months in Ft. Myers, Florida.  According to Kyle's brother, Sean, a former Army soldier,

Kyle knew his father had a gun and where it was stored since Kyle discovered it staying with his father in Ft. Myers.  This gun was stored in the same night stand in Clearwater as it was in Ft. Myers. It was stored in both locations in the same Army bag.  However, it was a family heirloom and it had no bullets in Ft. Myers.  Why did it have bullets in Clearwater?  Why would anyone buy bullets for a family heirloom?  Kyle never shot this gun while he lived with Tom Brennan in Ft. Myers as claimed by Tom Brennan. **[Sean Brennan Declaration - Exhibit 9]**.  Then why lie about that?

In *Wyke v. Polk County School Bd.*, 129 F.3d 560 (11th Cir. (Fla.) 1997), where a 13-year-old committed suicide, the mother and grandmother with whom the child resided thought that the child should receive counseling for anger problems which they both observed.  They knew he had behavioral problems.  The court found a jury could reasonably conclude that an ordinarily prudent person would have foreseen that the child needed help and that their negligence was properly submitted to the jury.  The court cited *Rafferman v. Carnival Cruise Lines, Inc.*, 659 So.2d 1271,1273 (Fla. 3rd DCA 1995), which stated that where there is evidence of a serious medical problem, so as to put one on notice that a person required protective precautions to ensure his safety, exposes one to liability for suicide.

There is ample evidence, or at least inferences from the evidence, which preclude summary judgment in this matter.  All Defendants were on notice of Kyle Brennan's mental state, especially their concern that he should not be left alone.

III.   **LEGAL CAUSE**

It is a jury question as to whether or not the intentional and reckless acts and/or the breach of duty was a legal cause of death.   When Kyle Brennan was seeing his psychiatrist, Stephen McNamara, M.D., Kyle did not exhibit suicidal ideation.   **[McNamara deposition - Exhibit 10, p.36:6-14]**.   He had no eating disorder.   **[p.39]**.   No panic attacks.   **[p.43]**.   No hallucinations.   **[p.49]**.   No suicide potential.   **[p.51]**.   Kyle rated his depression 5-6 on a scale of 10.   **[p.29:18-19]**.   Nothing in his life was causing his symptoms.   **[p.32]**.

Kyle was taking his Lexapro, which Dr. McNamara prescribed because it was fast acting-get results in days, not weeks, and it had a low side effect profile.   **[p.71]**

Kyle described his mother, Victoria, as a nice person, loving, and caring **[p.82]**, a safe power, warm, reliable, and consistent. **[p.118]**.   His father was the complete opposite-angry, brittle, volatile, "always blew up at me." **[pp.85, 100, 105]**, Kyle was worried that he would become like his father. **[p.107]**.

Dr. McNamara concluded by stating that within reasonable medical certainty, the abrupt withholding of Lexapro would clearly be a precipitating cause of suicide.   **[p.140]**.   The "steady state" of Lexapro is within 7 days.   **[p.144:17]**.   If Kyle had prior irregular use, it does not matter.   It is the daily use of Lexapro in February 2007 and then its abrupt withdrawal which is the controlling factor.   The half life of Lexapro is 27 to 32 hours, i.e., a relatively rapid metabolized drug.   Usually within day one of the missed dose or day two, the patient will experience all of those physical and emotional symptoms verses if the drug is tapered off.   **[p.147]**.   Kyle would have felt better at the steady state.   But once Kyle loses control of the Lexapro when it is locked up, that can lead to very significant outcomes

that would be deleterious. **[p.150]**. Kyle could have taken one pill every 3-4 days and still

feel effect of the Lexapro. **[p.151]**. Sleepiness is a side effect of taking too much Lexapro.

**[p.153:4]**. There is a further effect on Kyle by his knowing that his father locked up the

Lexapro and it is for the very first time out of his control. **[p.222].**

The medical certainty opined by Dr. McNamara establishes the evidence of legal

cause. Legal cause of the suicide is a question for the jury. *Wyke v. Polk County School

Bd.*, 129 F.3d 560 (11th Cir. (Fla.) 1997)**.**

## IV.    NO RELIGIOUS IMMUNITY FOR ACTIONS RESULTING IN DEATH

Defendants claim the First Amendment to the United States Constitution and the

Free Exercise Clause and state law protect their conduct from judicial scrutiny.

> The First Amendment affords no such protection for actions
> rather than belief. Mutual and generally applicable general
> laws may be applied to an individual without compelling
> justification even if they conflict with his religious beliefs.

*Church of Scientology Flag Service Organization v. City of Clearwater*, 2 F.3d 1514 (11th

Cir. 1993). With all this said, the Defendants are not immune from their actions because

of their religious beliefs. The free exercise clause in the United States Constitution

provides only limited protection for the expression of those beliefs and especially actions

based on those beliefs. *Cantwell v. Connecticut*, 310 U.S. 296, 303-304, 60 Sup.Ct. 900,

903-094, 84 L.Ed. 1212 (1940). It is the freedom of true religious beliefs that is absolutely

guaranteed. The freedom of action based upon those religious beliefs are not guaranteed**.**

*Id.*

The government cannot constitutionally burden any belief no matter how outlandish or dangerous.   However, in certain circumstances, the government can burden an expression of belief which adversely affects significant societal interests.

For example, the preservation of life will justify an outright ban on an important method of expressing a religious belief, i.e., ritual sacrifice of humans.

In *Wollersheim v. Church of Scientology*, 212 Cal.App.3d 872, 66 Cal.Rptr.2d 1 (Cal. App. 2 Dist. 1989), the Scientology member, Lawrence Wollersheim, located in Clearwater, Florida, was subjected to outrageous conduct by Flag Landbase when the church held him captive and continued "auditing" on Mr. Wollersheim although his sanity was repeatedly threatened by this practice and Wollersheim was compelled to abandon his wife and family through the policy of disconnect.   When his mental illness reached a state that he actually planned suicide, he was forbidden to seek professional help.   The "church" then subjected him to financial ruin through its policy of **"fair game"** when he was actually able to leave the church.   The court held that these acts exceeded all bounds of decency that warranted liability against the Church of Scientology.   After thoroughly analyzing the significant decisions across the country, the court specifically held that the Scientology actions of fair game in subjecting Wollersheim to mental torture would not be protected religious activity even with Wollersheim fully and voluntarily participating.   *Wollersheim*, at 898.   The court analyzed what limitations could be placed on the Church of Scientology in its bizarre behavior by first asking the following questions:

> Should any church seek to resurrect the inquisition in this country, does anyone doubt that the American government has the authority under the Constitution to halt the torture and execution?   Should anyone seriously question the right of

> victims of our hypothetical modern day inquisition to sue their tormentors for any injuries, physical or psychological, they sustained?

*Wollersheim*, at 888.

The court in *Wollersheim* concluded that the freedom of religion guarantees of the U.S. and California Constitutions do not immunize the practices of Scientology against Mr. Wollersheim from civil liability for any injuries caused. *Id.*, at 897. In *Wollersheim*, Mr. Wollersheim tried to leave and he was discovered and seized by several Scientology members, who held him in captive. The court stated that their actions lose religious significance when it is coerced and inflicted on citizens. *Id.*

## V.    EVIDENCE SUPPORTS PUNITIVE DAMAGES FOR WRONGFUL DEATH

The Defendants admit that misconduct necessary to support a claim for punitive damages is the same conduct that is necessary to sustain a conviction for manslaughter, citing the cases of *In re Leli,* 420 B.R. 568, 571 (Bankr. M.D. Fla. 2009); *Chrysler Corp. v. Wolmer,* 499 So.2d 823, 824 (Fla. 1986*); and White Construction Co. v. DuPont*, 455 So.2d 1026, 1028 ( Fla. 1986). As a defense to punitive damages, Defendants mistakenly rely upon the lack of any criminal arrest. That is no defense at all. The fact remains that Defendants intentionally imposed their church policies on Kyle Brennan resulting in his death. Certainly, the reckless, willful, wonton and intentional acts would justify manslaughter. The opinions of law enforcement are not admissible nor will they supplant the opinions of a civil jury and the Estate's right to a jury trial.

WHEREFORE, the Plaintiff requests this court to deny the Defendants' Motion for Summary Judgment.

I HEREBY CERTIFY that on September 27, 2010, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system which will send a notice of electronic filing to the following: LEE FUGATE, ESQ. Attorney for the Defendants, Denise Miscavige Gentile and Gerald Gentile; F. WALLACE POPE, ESQ. and ROBERT POTTER, Attorneys for Church of Scientology Flag Service Organization, Inc.; and RICHARD ALVAREZ, ESQ.,1509 West Swann Avenue, Suite 240, Tampa, Florida 33606, Attorney for Thomas Brennan.

**/s/ KENNAN G. DANDAR**
KENNAN G. DANDAR, ESQ.
Florida Bar No. 289698
DANDAR & DANDAR, P.A.
5509 West Gray Street, Suite 201
Post Office Box 24597
Tampa, Florida 33623-4597
PH:(813)289-3858 / FX:(813)287-0895
Attorney for Plaintiff
kgd@DandarLaw.net

# EXHIBITS FILED SEPARATELY DUE TO SIZE EXCEEDING 5 MB.