UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION


ESTATE OF KYLE THOMAS BRENNAN,

     Plaintiff,

v.                                CASE NO.  8:09-cv-264-T-23EAJ

CHURCH OF SCIENTOLOGY FLAG
SERVICE ORGANIZATION, INC.;
DENISE GENTILE; GERALD GENTILE;
and THOMAS BRENNAN,

     Defendants.

_____/


**<u>ORDER</u>**

In February, 2009, on behalf of Kyle Thomas Brennan, her deceased son,

Victoria L. Britton sued (Docs. 1 and 215) the Church of Scientology Flag Service

Organization, Inc.; Gerald and Denise Gentile; and Thomas Brennan, Kyle's father.

On September 8, 2010, the defendants jointly moved (Doc. 118) for summary

judgment. The plaintiff opposes (Docs. 143 and 170) the motion. On October 13,

2010, the parties orally argued (Doc. 175) the motion. On October 25, 2010,

Scientology's notice of appeal from an unrelated order deferred determination of the

motion for summary judgment. Receipt in the district court of the circuit court of

appeals' mandate (Doc. 220) again presents for disposition this long-pending motion

(the district court probably retained jurisdiction to dispose of the motion throughout

the appeal, but deferring disposition avoided at least one among a lengthy, expensive, and strenuous series of quarrels in this action).

**************************************

The plaintiff's component of the pre-trial stipulation (Doc. 166, pp. 2-3) includes this precis by the plaintiff of the allegation of wrongful death:

> Kyle Brennan, a 20 year old college sophomore, flew to Clearwater, Florida on February 8, 2007 to visit his father, Thomas Brennan, before returning to his home in Charlottesville, Virginia. Kyle arrived with a bottle of anti-depression medication, Lexapro, prescribed by his psychiatrist, Stephen McNamara, M.D. Kyle had left his home in Charlottesville on November 27, 2006, and flew to Des Moines, Iowa to look for colleges, taking his community college classes online as he traveled. He traveled from Des Moines to San Diego, CA, where he visited his father's two sisters, then flew to Hawaii upon the suggestion of his uncle. In Hawaii he was assaulted on February 5, 200[7], and then flew to Tampa on February 7 or 8, 200[7]. Before his arrival he had told his uncle, Gary Robinson, that he had been taking his Lexapro consistently since the assault on February 5 and would continue to do so until he returned home in Virginia. Upon his arrival in Clearwater at his father's apartment, his father thought he was suicidal, slept most of the day, and should not be left alone. Thomas Brennan, a Scientologist, told his Scientology counselor, Denise Gentile, of his son being on psychotropic medication prescribed by a psychiatrist. Both psychiatry and the taking of psychotropic drugs are abhorrent to Scientologists. Following Scientology policy, Denise Gentile then told this to a Scientology Ethics Officer, who then gave written instructions to Thomas Brennan to remove his son from the apartment and "handle" his son per Scientology policy, even though Kyle was never a Scientologist. In compliance with the commands from the Scientology Ethics Officer, Thomas Brennan locked the prescription Lexapro in the trunk of his car and had his son pack his bags and strip his bed of linens. Thomas Brennan then told Kyle's mother, Victoria Britton in Charlottesville, VA, that Kyle had to move out. Within 24 hours, Kyle Brennan was dead from a single shot of a 357 magnum handgun inside the father's bedroom. Kyle Brennan's psychiatrist, Dr. McNamara, has opined that the abrupt removal of the antidepressant coupled with Kyle's knowledge that he could not gain access to this medication had a deleterious effect on Kyle Brennan which substantially precipitated his death, if it was a suicide.

Victoria Britton, as the Administrator of the estate now brings a wrongful death action against these defendants for the death of her son, Kyle Brennan, seeking both compensatory and punitive damages.

An evaluation of the pleadings and other papers in the record reveals that the plaintiff alleges in particular (1) that Kyle's father and Gerald and Denise Gentile, each aware of Kyle's condition and acting in concert and in disregard of Kyle's safety, "assumed a common law duty of care for Kyle Brennan," tortiously withdrew from him the medically necessary Lexapro, and proximately caused an abrupt escalation in the severity of his condition, which caused his suicide, and (2) that "one or more of the defendants," despite knowledge of Kyle's "mentally deteriorated state," placed in Kyle's father's bedroom, or otherwise permitted Kyle access to, a loaded .357 magnum handgun, with which Kyle committed suicide. The plaintiff alleges a relation of principal and agent between Scientology, on the one hand, and Kyle's father, Gerald Gentile, and Denise Gentile, on the other hand, and alleges that the tortious acts of the three that purportedly led to Kyle's suicide were within the scope of the agency with, and perforce attributable to, the principal, Scientology.

After a detailed elaboration of the facts (with laudable attention to the inclusion of explicit and helpful record citations) the defendants identify five factual defects that the defendants believe fatally afflict the plaintiff's single claim under the "Florida Wrongful Death Act," Sections 768.16 – 26, Florida Statutes:

- Plaintiff has no evidence to show or suggest that Kyle was consuming the Lexapro on a consistent basis necessary to obtain a therapeutic benefit.

- Plaintiff has no evidence to show or suggest the Lexapro was removed without Kyle's permission.

- Plaintiff has no evidence to show or suggest that any defendant encouraged or assisted Kyle in committing suicide.

- Plaintiff has no evidence to show or suggest that any defendant gave him access to a loaded gun.

- Plaintiff has no evidence to show or suggest that Kyle committed suicide for any reason other than his depression and paranoia.

(Doc. 118 at 13) A close and objective examination of the extensive record developed in this action confirms the soundness of the defendants' attack on the plaintiff's claim. The plaintiff's claim of Scientology's complicity in, and responsibility for, Kyle's death remains a mere hypothesis that is without essential support based upon reasoned and direct inference from the available evidence. In particular and in a manner fatal to the plaintiff's claim, the available evidence leaves irreparable gaps in the plaintiff's proposed historical sequence and irreparable gaps in the causal relation between persons and events and their respective consequences.

**************************************

In the approximately eighty days beginning on November 27, 2006, and preceding his suicide late on the night of February 16, 2007, Kyle suddenly, unexpectedly, and without parental approval departed his mother's home in Charlottesville, Virginia, and traveled to Iowa, to California, to Hawaii, and finally to Clearwater, Florida, to the apartment in which his father lived. During this

itinerant interlude between November and February, Kyle occasionally telephoned his mother, occasionally contacted family members, and briefly lived with an aunt in California. A review of Kyle's written and oral statements and the recollections and observations of those to whom he spoke or with whom he otherwise communicated confirms that he evinced distinct signs of emotional turbulence and distress and that he lodged against his family and friends accusations of disloyalty, prospective violence, and other treachery. During his travel Kyle contacted more than two dozen governmental agencies and lodged complaints in an effort to initiate criminal proceedings against most or all of his immediate family, whom Kyle believed harbored criminal intentions against him. On February 6, 2007, ten days before his death, Kyle in San Francisco telephoned his father in Clearwater. Kyle and his father agreed that Kyle would fly promptly to Clearwater. Kyle arrived the next day in a somewhat bedraggled and agitated state.

Before Kyle left Charlottesville in November, 2006, the psychiatrist Stephen McNamara examined Kyle, opined that Kyle suffered from depression, prescribed Lexapro, and issued a prescription for one five-milligram tablet per day for thirty days with one permitted re-fill. Dr. McNamara increased the prescription to one ten-milligram tablet per day for thirty days, and Dr. McNamara provided for the original prescription and six re-fills. The pharmaceutical history attests that the first prescription was filled immediately but only filled once and that the second prescription was filled originally plus six re-fills. The interval for the re-fills was

sequentially twenty-eight days, thirty-nine days, forty-five days, forty-seven days, thirty-three days, seventy-three days, and fifty-six days. The final re-fill was obtained on November 24, 2006, before Kyle left Charlottesville. The applicable mathematics, although disputed (and even if different than stated above, as the plaintiff claims), eliminates consistent daily consumption from the first day as prescribed by the doctor. No other pertinent conclusion about the frequency and the duration of Kyle's medication is either finally eliminated or finally established by the evidence. A fact finder is left to guess.

Any important or pertinent conclusion about the frequency and the duration of Kyle's medication depends upon mere speculation and attenuated inference compounded upon attenuated inference. One must infer from the filling of the prescription that Kyle took the medicine, one must infer from the inferred taking of the medicine that Kyle took the medicine daily, one must infer from the inferred daily taking that those days of daily taking immediately preceded the day on which Kyle handed the medicine to his father, and further one must infer from the inferred daily taking a duration of the daily taking sufficient to induce the suicidal impulse that the plaintiff alleges was created by the sudden discontinuation (itself inferred) of Lexapro. The evidence warrants none of these layered inferences. The plaintiff proposes both these compounded inferences and yet another unavailable inference. The plaintiff suggests obliquely but unmistakably throughout the pertinent papers that Kyle's suicide itself evidences the persistent consumption and the subsequent

sudden discontinuation of the Lexapro. But inferring specific links in a chain of cause from the occurrence of a specific effect is yet more dicey and logically impermissible than compounding inferences to deduce a particular effect from a series of possible causes. With respect to the cause of Kyle's suicide, a fact finder is left to guess.

This proliferation of compounded inference and speculation provides no basis on which to create a genuine issue of material fact. As argued by the defendants, the record presents no evidence to create a genuine issue about when or with what frequency Kyle took Lexapro or stopped taking Lexapro in the days preceding his death. Therefore, the record presents no evidence to create a genuine issue about whether Kyle received a therapeutic effect from the Lexapro or was adversely affected by any discontinuation of the Lexapro. Maybe he did and maybe he didn't take Lexapro regularly at some time; maybe he was and maybe he wasn't helped (or hurt) by the Lexapro; maybe he was and maybe he wasn't adversely affected by discontinuation. The record, including the proffered expert testimony, offers nothing on which to create a rationally triable issue one way or the other; the plaintiff's proposed history is merely possible but no more possible than several other possible histories, each of which exculpates Scientology and the other defendants. Two days before he left Charlottesville to wander, Kyle had thirty-five tablets of Lexapro. When he surrendered the Lexapro to his father, Kyle had sixteen tablets remaining. When and with what frequency did Kyle consume the tablets (if he did) between

leaving Charlottesville and arriving at his father's apartment seventy-three days later and to what effect, good or bad? A fact finder is left to guess.

*****************************

As stated, the plaintiff's claim against each defendant depends on Kyle's taking Lexapro at the right time, in sufficient amount, with the correct frequency, and for the correct duration such that Kyle's discontinuing Lexapro, allegedly by force of his father's demand, which in turn arose allegedly from the intervention and insistence of Scientology, generated a deleterious psychological effect ("anti-depressant discontinuation syndrome") – more specifically, a suicidal impulse – and consequently created some liability in Scientology and the other defendants, who allegedly were acting in concert with, and at the behest of, Scientology. Because the proof concerning Kyle's consumption of Lexapro fails, the plaintiff's claim for wrongful death inevitably fails, and summary judgment is warranted. However, assuming for the sake of further analysis that the evidence offers direct proof of, or at least a direct inference of, Kyle's taking Lexapro exactly how and when prescribed and similarly supports Kyle's experiencing both the desired therapeutic benefit and the supposed suicidal impulse attributable to an abrupt discontinuation of Lexapro, does the evidence – even under that unwarranted assumption – create a genuine issue of any defendant's causing either Kyle's cessation of Lexapro or his surrendering the Lexapro to his father?

On February 6, 2007, seventy-one days after departing Charlottesville to wander across America, Kyle called from the San Francisco airport to talk to his father in Clearwater. Of course, only Kyle and his father have first-hand knowledge of who said what to whom. The father's unrebutted testimony is that Kyle reported a shortage of money and wanted to travel immediately to Clearwater "to rest and chill out before coming home." Kyle arrived at his father's apartment in Clearwater the next day. The father reports that Kyle was thin, complaining, untidy, uncertain, and anxious about the future.

The record is clear that Kyle soon relinquished his Lexapro to his father, who is the sole source of testimony about the attendant circumstances. The father reports that Kyle – acting unilaterally and voluntarily – presented the Lexapro to his father and said, "I hate this shit. It makes me sick." Kyle's father claims he took the Lexapro to a local library, researched the pharmacology of Lexapro, and placed the Lexapro in the trunk of his car. No other direct evidence or permissible inference describes the circumstances of Kyle's surrendering the Lexapro to his father. Neither direct evidence nor direct inference supports any conclusion except that Kyle relinquished the Lexapro to his father voluntarily at a moment when Kyle – with the consent of his step-father and mother in Charlottesville – had not seen his psychiatrist in almost a year and when Kyle had declined on more than one occasion to resume psychiatric treatment – all this without the involvement of Scientology or another defendant.

The plaintiff constructs a scenario of liability that originates with the undisputed premise that stern opposition to modern psychiatry in general and psychotropic medication in particular is a guiding tenet of Scientology. The plaintiff attempts to connect Scientology's institutional opposition to psychotropic medication to Kyle's father's admission that he mentioned Kyle's use of Lexapro to Denise Gentile, who served as the father's auditor within their mutual practice of Scientology.

The plaintiff next begins a wholesale compounding of inferences and a concatenation of speculation. The plaintiff supposes, because Denise allegedly knew that Kyle took Lexapro and because Denise was the auditor of Kyle's father within Scientology, which opposes psychotropic medication, that either on her own or in conformity with instructions from an ethics officer (Denise's supervisor in her role as auditor) within Scientology, Denise conveyed to, and imposed on, Kyle's father the command of Scientology to seize the Lexapro from Kyle, which seizure aggravated fatally Kyle's emotional turbulence. However, the evidence reveals that Denise did not know that Kyle took Lexapro until after Kyle had surrendered the Lexapro to his father (therefore, no possibility or need existed to seize the Lexapro), that Denise did not see Kyle during his 2007 visit to Clearwater (and had seen him only briefly and uneventfully a year before), and that Denise was not fully informed about Kyle's mental and physical condition. The record is devoid of evidence either that Denise conveyed to her ethics officer information about Kyle's formerly taking Lexapro or

that Denise conveyed an order (or even an instruction or even advice) concerning Lexapro from Scientology's ethics officer to Kyle's father.

The plaintiff claims the record contains a piece of evidence that the plaintiff characterizes as a "smoking gun." (Doc. 143, page 13) This item (Doc. 118, Ex. 15) is an entry, a single sentence, one of seven (the other six redacted after judicial inspection confirmed irrelevance), that appears in a February 15, 2007, communication between Denise Gentile as the auditor of Kyle's father within Scientology and the ethics officer overseeing Denise Gentile in her role as a student auditor. The entry, which conveys the remarks of the ethics officer, states, "Get your son moved out and get him set up somewhere so that he can be handled." All parties agree that "your son" means Kyle and that this entry is directed at Kyle's father the day before Kyle's death. This entry shows that an ethics officer within Scientology advised an active practitioner of Scientology to move a troubled non-Scientologist from the practitioner's residence and to somewhere that assistance was available for the non-member. No evidence exists that anything at all occurred as a result of this entry, no evidence exists that Denise Gentile did anything because of this entry, no evidence exists that Kyle's father did anything because of this entry, and no evidence exists that anything either happened or failed to happen to Kyle because of this entry.

To reason as the plaintiff proposes, one must infer (from what?) that Kyle's father timely told Denise about Kyle's taking psychotropic medication (which he was no longer taking on February 15, the day of the disputed entry), one must infer (from

what?) that Denise in turn told the ethics officer about the psychotropic medication (which the entry fails to mention), one must infer (from what?) that the ethics officer's statement "Get your son moved out and get him set up somewhere so that he can get handled" conveys the quite different instruction "Get your son moved out and get him set up somewhere so that he can get handled and immediately deprive your son of Lexapro." In fact, nothing in this entry even alludes to Lexapro. Nothing suggests that Denise reported to the ethics officer anything about Lexapro or that Scientology issued advice or instruction about Lexapro through the ethics officer to Denise to Kyle's father.

Fairly construed, the entry suggests that Kyle's father told Denise that Kyle was troubled, that Denise told the ethics officer about Kyle's presence in his father's apartment, and that the ethics officer recommended that Kyle move elsewhere and away from his father rather than remain in the apartment idle, frustrated, anxious, and often alone. Scientology's advice to move someone to someplace that assistance is available is hardly a basis – without a great deal more, which is not available – for civil liability for wrongful death. The plaintiff's tendered explanation of the meaning of the term "handled" within Scientology adds little or nothing to support the plaintiff's extravagant claims.

In effect, the plaintiff argues that Scientology's institutional opposition to psychotropic medicine is such a potent fact that the fact permits against Scientology the inference, even absent direct support in the evidence, that Scientology actually

did anything that Scientology could possibly have done in furtherance of Scientology's opposition to psychotropic medication. Specifically, the plaintiff advances the proposed and necessary (to the plaintiff's theory) inference that, because Kyle's father possessed Kyle's Lexapro, Kyle's father – acting obediently to the command of Scientology and in furtherance of Scientology's policy against psychotropic medication – seized the Lexapro from Kyle against Kyle's will and caused a suicidal impulse that Kyle failed to resist and for which impulse Scientology is accountable. (Of course, implicit in this is the effective negation of every other reason, patent in the record, that this demonstrably disturbed young man committed suicide.) Assuming that Kyle's father and the others are liars, Scientology's responsibility is possible, but this theoretical and remote possibility is unsupported by evidence or any reasonable and direct inference from the evidence. If the witnesses are ignored in gross as liars, the fact finder is left to guess. Attenuated and compound inferences and speculation uniformly fail to create a genuine issue of material fact sufficient to avoid summary judgment.

****************************

The record confirms that Kyle foraged through his father's bedroom in his father's absence and without his father's (or anyone else's) knowledge or consent; that Kyle located first a handgun and, foraging further, located ammunition that he suspected was on the premises (Kyle knew his father had the handgun months earlier when his father lived in another city); and that Kyle killed himself with the handgun

after barricading himself into his father's bedroom. No evidence suggests that Scientology or the Gentiles knew of the handgun in even the remotest manner or had reason to suspect the presence of the handgun in the father's apartment. Both Scientology and the Gentiles are in this record utterly unconnected to the handgun and the ammunition.

The record is devoid of evidence to support the inference that Scientology or the Gentiles knew or reasonably should have known (in fact, no one appears to have known) that Kyle was subject to an irresistible suicidal impulse. Scientology and the Gentiles were quite remote from any fact (if any existed) capable of informing an observer of the imminent probability of suicide. Of course, the record is devoid of evidence to support the inference (this statement is odd, indeed, to include in this order) that any defendant promoted or assisted or procured Kyle's suicide.[*] In fact, the record contains nothing to create the slightest doubt that the defendants would have mightily exerted themselves to avoid Kyle's suicide (or any other person's

---

[*] Paragraph 11 of the amended complaint is a dramatic and galvanizing paragraph, which alleges in part:

> [O]n or about February 16, 2007, for reasons yet unknown to the [plaintiff], one or more of the defendants, knowing that Kyle Brennan was a disabled adult, negligently, recklessly, wantonly or wilfully, callously, and with total disregard for the rights and safety of Kyle Brennan placed, or provided access to, a loaded 357 Magnum pistol owned by Thomas Brennan, on or next to the bed of Kyle Brennan in the bedroom only occupied by Kyle Brennan in the apartment of Thomas Brennan.

Excepting that Kyle's father owned a gun, no fact alleged in this paragraph appears in the record in this action. The allegation at least approaches sanctionable recklessness in pleading.

suicide) had anyone had knowledge of Kyle's suicidal impulse. Again, with any troubled person, perhaps especially a troubled young adult, suicide is possible, but the mere possibility of suicide (omnipresent) equals neither the imminence of suicide nor the probability of suicide and generally charges no one with the affirmative duty to intervene officiously and assume the management of another's life in an effort to preempt the possible occurrence of suicide. A special relation, such as the incarceration or institutionalization of a person known to suffer from an acute psychological condition or the occurrence of a patent suicidal frenzy, can impose a legal duty of vigilance against suicide, but no special relation exists in this case.

In a somewhat strained and haphazard effort to identify some source for the defendants' alleged liability, the plaintiff invokes Section 825.102, Florida Statutes, which is inapplicable for several reasons, including that Kyle was not a "disabled adult" as defined in Section 825.101(4) and that no defendant is a "caregiver" as defined in Section 825.101(2).

In a similar effort, the plaintiff tries Section 790.17, Florida Statutes, which creates a misdemeanor (and, presumably, negligence *per se* as a consequence) if a person "sells, hires, barters, lends, transfers, or gives to any person of unsound mind . . . any dangerous weapon." Kyle was not of "unsound mind." More decidedly, the record contains no evidence of sale, hire, etc. Section 790.17 is inapplicable.

In a final try at a statutory hook, the plaintiff asserts Section 768.1355, Florida Statutes, the "Florida Volunteer Protection Act." This statute aims to relieve a

volunteer of liability incurred in the course of service to a non-profit organization if the volunteer acted reasonably and in good faith in causing the pertinent damage. To protect and encourage the charitable volunteer, the statute shifts the innocent volunteer's liability to the organization. As the defendants explain in the papers supporting summary judgment, the plaintiff's claim under Section 768.1355 is hopelessly illogical. The plaintiff's wrongful death claim requires some wrongful conduct by the defendants but Section 768.1355 visits liability on the organization for the acts of the charitable volunteers only if the volunteers acted reasonably. Of course, the record fails to support the notion that the individual defendants acted within the meaning of the statute as "volunteers" for Scientology in the pertinent events. Section 768.1355 is inapplicable.

With respect to Scientology and the Gentiles every effort of the plaintiff to factually implicate any one of them in causing Kyle's death or to legally ensnare any of them in liability must fail on this record. Neither Scientology nor the Gentiles is charged by the law with a duty in the circumstances of this case to insulate Kyle against suicide. None assumed such a duty. Nothing done by any of the three and nothing that any of the three failed to do caused Kyle's death.

**************************************

The nearest the plaintiff comes to formulating a claim against a defendant is the assertion (not stated in altogether cogent terms, if at all), first, that Kyle's father owed Kyle a duty to maintain the premises in a reasonably safe condition during

Kyle's stay and that, observing Kyle's distressed psychological state and knowing Kyle's history, Kyle's father should have known that the presence in the apartment of a handgun and ammunition created an unreasonable risk of Kyle's committing suicide. *Florida Standard Jury Instructions (Second Edition; Civil)*, §§ 401.16 and 401.20.

Neither the plaintiff nor a defendant cites any decisional precedent from Florida or elsewhere, state or federal, that convincingly and authoritatively addresses circumstances impressively similar to the singular circumstances attending Kyle's death. The plaintiff begins with *Wood v. Camp*, 284 So. 2d 691 (Fla. 1973), in which Florida adopts a uniform standard of reasonable care for both a commercial and a social invitee onto someone's premises. The plaintiff's development from *Wood* of the theory of premises liability is unfortunately (and typically) truncated, erratic, intemperate, incomplete, and unsupported by a comprehensible delineation of reasoning and authority. The defendants conclude in response, but unpersuasively, that Kyle's father's limited duty to Kyle as a licensee was "merely 'to refrain from willful misconduct or wanton negligence, to warn of known dangers not open to ordinary observation, and to refrain from intentionally exposing [Kyle] to danger.'" [quoting *Porto v. Carlyle Plaza, Inc.*, 971 So 2d. 940, 941 (Fla 3d DCA 2007), *review denied*, 982 S0. 2d 1178 (Fla. 2008)] Both the plaintiff's explanation (such as it is) and the defendants' explanation are unsatisfying.

The record is devoid of either evidence or a reasonable and direct inference from evidence that supports a claim that any defendant, including particularly Kyle's

father, acted recklessly or intentionally or with wanton or willful disregard in a manner that resulted in Kyle's suicide. Therefore, at most, the record justifies asking whether Kyle's father's mere possession of an unloaded gun and nearby ammunition on the premises and his failure to absolutely secure that gun and ammunition against discovery by Kyle constituted the maintenance of premises not in a reasonably safe condition and, consequently, constituted the proximate and foreseeable cause of Kyle's wrongful death by suicide.

*Wood* provides a useful formulation of the governing foundation of premises liability in Florida:

> [T]he class of invitees . . . entitled to reasonable care is expanded to include those who are 'licensees by invitation' of the property owner, either by express or reasonably implied invitation. We thereby eliminate the distinction between commercial (business or public) visitors and social guests upon the premises, applying to both the single standard of reasonable care under the circumstances.

284 So.2d at 695. The exact application of *Wood's* unified "reasonable care" statement received further authoritative exploration in *McCain v. Florida Power Corp.*, 593 So.2d 500 (Fla. 1992), which involved an injury incurred when the blade of a mechanical trencher struck an underground electrical cable after a power company employee marked the area as "safe." Correcting confusion in the lower court, *McCain* discusses the often indistinct boundary demarcating duty, foreseeability, and proximate cause:

> Where a defendant's conduct creates a *foreseeable zone of risk*, the law generally will recognize a duty placed upon defendant either to lessen the risk or see that sufficient precautions are taken to protect others

from the harm that the risk poses. [c-o] Thus, as the risk grows greater, so does the duty, because the risk to be perceived defines the duty that must be undertaken.

. . . .

[E]ach defendant who creates a risk is required to exercise prudent foresight whenever others may be injured as a result. This requirement of reasonable, general foresight is the core of the duty element.

593 So.2d at 503. Florida law imposes on Kyle's father a duty to Kyle of "reasonable general foresight" within the "foreseeable zone of risk" (the Supreme Court of Florida perhaps meant "zone of foreseeable risk") during Kyle's consensual stay on the premises.

Florida characterizes a firearm as a dangerous instrumentality. *Kitcher v. K-Mart Corp.*, 697 So.2d 1200 (Fla. 1997). Presumably, the possession of a dangerous instrumentality on a premises creates at least some increment of duty to a social guest, the specification of which duty triggers the notions of foreseeability and proximate causation. Again, *McCain* is authoritatively helpful and states:

In the past, we have said that harm is "proximate" in a legal sense if prudent human foresight would lead one to expect that similar harm is likely to be substantially caused by the specific act or omission in question. In other words, human experience teaches that the same harm can be expected to recur if the same act or omission is repeated in a similar context. [c-o] However, as the *Restatement (Second) of Torts* has noted, it is immaterial that the defendant could not foresee the *precise* manner in which the injury occurred or its *exact* extent. *Restatement (Second) of Torts* § 435 (1965). In such instances, the true extent of the liability would remain questions for the jury to decide.

On the other hand, an injury caused by a freakish and improbable chain of events would not be "proximate" precisely because it is unquestionably unforeseeable, even where the injury may have arisen from a zone of risk. The law does not impose liability for freak injuries

that were utterly unpredictable in light of common human experience. Thus, as the *Restatement (Second) of Torts* has noted, a trial court has discretion to remove the issue from the jury if, "after the event and looking back from the harm to the actor's negligent conduct, it appears to the court highly extraordinary that [the conduct] should have brought about the harm." *Restatement (Second) of Torts* § 435(2) (1965).

593 So.2d at 503-04. The Supreme Court of Florida recently in *Williams v. Davis*, 974 So.2d 1052 (Fla. 2007), again addressed and again avowedly attempted to clarify the relation between foreseeability and duty, on the one hand, and between foreseeability and proximate cause, on the other hand:

> In *McCain* . . . [w]e explained that establishing the existence of a duty requires demonstrating that the activity at issue created a general zone of foreseeable danger of a certain type of harm to others. . . . By contrast, establishing proximate cause requires a factual showing that the dangerous activity foreseeably caused the specific harm suffered by those claiming injury in the pending legal action.

974 So.2d at 1057. In other words, foreseeability informs the determination of a person's duty with respect to a certain type of harm and, as well, foreseeability informs the determination of whether certain conduct proximately caused certain harm.

Applying the former principle to this case results, first, in the question whether the presence of a firearm and ammunition on ones premises creates a zone of foreseeable danger that includes the danger of an adult's searching for, and finding, the firearm and ammunition and using the firearm for suicide. Second, the latter principle of *McCain*, restated in *Williams*, applied to this case, results in the question whether the father's merely possessing a firearm on the premises foreseeably and

proximately caused Kyle's suicide. Because suicide occurs with unfortunate and

tragic frequency, the law is not unfamiliar with the attendant issues.

For example, in *Chalhoub v. Dixon*, 788 N.E.2d 164 (Ill. App. 2003), the estate

of the defendant, who committed suicide at thirty-two, alleged that the step-father's

negligent handling and storage of a firearm proximately caused the defendant's

suicide:

> Chalhoub alleges the defendant was negligent in that he failed to
> remove the handgun from the premises; to secure the handgun; to
> render the handgun inoperable; to ensure that Christopher did not
> have access to the handgun; and to observe that Christopher had taken
> the handgun.

788 N.E.2d at 166. A former police officer, the step-father stored the handgun in a

"white t-shirt and placed it on a shelf in the closet of the master bedroom, behind

some shoes." The bullets were stored separately. The step-father knew the decedent

was depressed and had received counseling. The step-father permitted the decedent to

stay at his house intermittently for several days, during which the step-father was

occasionally absent for work. The decedent committed suicide with the step-father's

gun. The decedent's brother, administrator of the decedent's estate, sued the step-

father for wrongful death. The trial court granted summary judgment for the step-

father and, affirming, the appellate court explained:

> Whether Dixon had a duty to prevent Christopher's suicide depends
> on the suicide's foreseeability, its likelihood, the magnitude of the
> burden of guarding against it, and the potential consequences of
> placing that burden on Dixon. [c-o] Christopher's estate urges that
> Dixon should have foreseen that Christopher would use the gun to
> commit suicide because he knew that Christopher was suffering from

severe depression and because he knew Christopher had threatened to commit suicide. As we just noted, however, because Dixon was not a medical professional, he could not have reasonably been expected to foresee that his failure to secure his handgun would lead to Christopher using it to commit suicide.

Moreover, the magnitude of placing such a burden on Dixon to foresee and prevent a suicide is very great. Dixon cannot reasonably be expected to secure his home so as to prevent a suicide. Imposing such a burden would create an unreasonable risk of liability as the scope of such a burden would be ever expanding. Would such a burden include securing all knives, razors, aspirin, and other potentially harmful items in the home? What relationship is required to impose such a duty? Here, Christopher used a handgun, however, he could have just as easily used a kitchen knife or overdosed on aspirin. Further, Christopher was an adult who no longer resided in the Dixon home. For these reasons, we find that the estate fails to establish that Dixon had a duty to foresee and avoid Christopher's suicide.

Further, even assuming that Dixon had such a duty, the estate fails to show that Dixon's alleged negligence proximately caused Christopher's suicide. A proximate cause is one that produces an injury through a natural and continuous sequence of events unbroken by any effective intervening cause. [c-o]

It is well-established under Illinois law that a plaintiff may not recover for a decedent's suicide following a tortious act because suicide is an independent intervening event that the tortfeasor cannot be expected to foresee.

788 N.E.2d 539-40.

Whether explained by the absence of a duty to prevent an unforeseeable harm or explained by a lack of proximate cause because a suicide is an intervening cause that is unforeseeable, the law protects a person from liability for another's suicide absent a special relation or unless the defendant has facilitated or contributed to the suicidal impulse by some wrongful action. *Logarta v. Gustafson*, 998 F. Supp. 998 (E.D. Wis. 1998); *Gilmore v. Shell Oil Co.*, 613 So.2d 1272 (Ala. 1993); *Reynolds v.*

*National R.R. Passenger Corp.*, 576 N.E.2d 1041 (1991), *appeal denied*, 580 N.E.2d 133 (Ill. 1991); *Watters v. TSR, Inc.*, 904 F.2d 378 (6th Cir. 1990); *Civil Liability for Death by Suicide*, 11 A.L.R. 2d 751 (1950). Not even a psychiatrist is charged with a duty to predict, and prevent injury resulting from, "an individual's propensity to do violence to himself or others." *Paddock v. Chacko*, 522 So.2d 410 (Fla. 5th DCA 1988).

In sum, Kyle's father's mere possession of a handgun and ammunition neither creates a duty to prevent his adult son's unforeseeable suicide by use of the gun nor establishes that his adult son's suicide is a foreseeable consequence of that mere possession. Kyle's father is entitled to judgment in his favor as a matter of law.

## CONCLUSION

Kyle Brennan was an attractive and bright but troubled young man, who died violently, by his own hand, and alone, barricaded in his father's apartment. Plagued by emotional turbulence and mental instability, Kyle's brief life, especially the last year of his life, was tangled and traumatic both for Kyle and for his family and close friends. Kyle's mother seeks by this action to establish that the organization, principles, and operatives of Scientology are responsible – in fact and in law – for the death of her son.

A practitioner of modern psychiatry treated Kyle for his psychological afflictions and prescribed a course of psychotropic medication. Modern psychiatry and psychotropic medication are anathema to Scientology. Kyle's father was an incipient practitioner of Scientology. The fragile Kyle with his psychotropic

medication, Kyle's father with his Scientology, and Scientology with its opposition to psychotropic medication approached one another in close proximity during the time of Kyle's suicide. The plaintiff looks upon the proximity of Scientology to the death of her son and sees a causal link, sees the one brought about by the other. After painstaking review, I conclude that the plaintiff's suspicion, although perhaps not impossible, is not anywhere evidenced in the record or subject to reasoned and direct inference from the record. In other words, the record creates no genuine issue of material fact for reasoned determination by a jury. Each defendant is entitled to judgment as a matter of law.

The defendants' motion for summary judgment (Doc. 118) is **GRANTED**. The Clerk is directed to enter a judgment for each defendant and against the plaintiff, terminate any pending motion, and close the case.

ORDERED in Tampa, Florida, on _December 6th_, 2011.

Steven D. Merryday
UNITED STATES DISTRICT JUDGE